1   Samuel L. Boyd, Lead Counsel
     SBN: 02777500
2   6440 North Central Expy
     Suite 600
3   Dallas, Texas 75206
     (214) 696-2300
4   (214) 363-6856 fax

5   Donald R. Warren
     Phillip E. Benson
6   7825 Fay Ave., Ste. 200
     La Jolla, CA 92037
7   Telephone (858) 454-2877
     Facsimile  (858) 454-5878

8

9             IN THE UNITED STATES DISTRICT COURT
           FOR THE CENTRAL DISTRICT OF CALIFORNIA
10                   WESTERN DIVISION

11   UNDER SEAL               )  Case No.:
                      )  **CV07-06385 ER (CWX)**
12          Plaintiff    )  **FILED UNDER SEAL**
                      )
13   vs.                  )
                      )  **PLAINTIFF'S COMPLAINT**
14   UNDER SEAL               )  **PURSUANT TO 31 U.S.C.**
                      )  **$$ 3729-3732, FEDERAL**
15          Defendant.   )  **FALSE CLAIMS ACT**
                      )
16  _____   **JURY TRIAL DEMAND**

17

18            **CASE UNDER SEAL**

19

20

21

22

23

24

25

26



                Plaintiff's Complaint - 1



1 | Samuel L. Boyd, Lead Counsel
SBN: 02777500
2 | 6440 North Central Expy
Suite 600
3 | Dallas, Texas 75206
(214) 696-2300
4 | (214) 363-6856 fax

5 | Donald R. Warren
Phillip E. Benson
6 | 7825 Fay Ave., Ste. 200
La Jolla, CA 92037
7 | Telephone (858) 454-2877
Facsimile   (858) 454-5878

8

9 |          IN THE UNITED STATES DISTRICT COURT
                FOR THE CENTRAL DISTRICT OF CALIFORNIA
                        WESTERN DIVISION

10

| UNITED STATES OF AMERICA, *Ex rel.*   ) Case No.:
11 | DARROL OLSEN, DARROL OLSEN,          )
individually,                          )
12 |                                     ) **FILED UNDER SEAL**
                                        )
13 |            Plaintiff                ) **PLAINTIFF'S COMPLAINT**
                                        ) **PURSUANT TO 31 U.S.C.**
14 | vs.                                 ) **§§ 3729-3732, FEDERAL**
                                        ) **FALSE CLAIMS ACT**
15 | LOCKHEED MARTIN CORPORATION,        )

16 |            Defendant.       **JURY TRIAL DEMAND**

17

18

19 |        On behalf of the United States of America, Relator Darrol O. Olsen

20 | (Olsen) files this *qui tam* complaint against defendant LOCKHEED MARTIN

21 | CORPORATION (Lockheed) to recover penalties and damages for violations of the

22 | False Claims Act, 31 U.S.C. 3729 *et seq.*   This action arises from false

23 | claims, false statements and false records made by Lockheed to the United

24 | States Air Force (USAF) during production of the "F-22 Raptor" (F-22).

25

26

Plaintiff's Complaint - 2

# I. PRELIMINARY STATEMENT

1.    In 1991, Lockheed entered into a contract with the USAF to produce the F-22.[1]    Stealthiness is a core feature of that aircraft intended to make it difficult for RADAR to detect.    In fact, the entire aircraft is designed around that feature.    Numerous components of the F-22 contribute to its planned stealthiness, such as the fighter's contours, its composite materials and the coatings applied to its skin.

2.    Despite the importance of stealthiness, Relator Olsen – who was a top Lockheed stealth engineer – witnessed Lockheed commit fraud regarding the F-22's stealth coatings.    Specifically, from September 1995 until June 1999 when he left Lockheed, Olsen witnessed Lockheed order and use coatings that Lockheed knew were defective.    Even after Olsen left the company, Lockheed continued to knowingly use defective coatings.    Based upon third-party reports, it appears that the defective coatings have not been remedied through the present date, but Lockheed has never fully disclosed the stealth defects to the USAF.

3.    Moreover, during the September 1995 through June 1999 period, Lockheed misrepresented to the USAF that the coatings were passing stealth tests and, thus, meeting contract specifications.    In addition, Lockheed actively concealed the stealth coatings failures from the USAF.    For example, Lockheed management often directed Olsen not to speak with the USAF about the coatings problems.    Indeed, on one occasion when Olsen protested the use of the failed coatings and stated that Lockheed had to tell the USAF about the problems, Lockheed manager David Trawinsky's response was: "It's political. Stay out of it."    On another occasion when Olsen again pressed him about the coating failures, Trawinsky stated: "No one cares.    We've got to meet the

---

[1] The F-22 was originally called the F-22. Its name was changed to emphasize its "attack" capability.

Plaintiff's Complaint - 3

1  milestones." [2]  Also Trawinsky told me on numerous occasions to "stay out of
2  it."   Richard Morrison, the Supervisor of the Materials and Processes Group,
3  warned Olsen "[I]t's political, stay out of it."

4      4.    All that mattered to Lockheed was that the USAF thought that the
5  coatings were satisfactory and that the F-22 program was timely proceeding so
6  that the USAF would continue to pay Lockheed's progress bills and milestone
7  bills.   On information and belief, Lockheed continued to misrepresent and
8  conceal the problems with the F-22's coatings through at least October 2004
   and likely to the present date.
9

10     5.    In effecting its fraud, Lockheed falsely certified that the
11 coatings were meeting stealth tests and, thus, meeting contact specifications
   in order to get paid.  Lockheed made those certifications when presenting the
12 progress bills and milestone bills for payment to the USAF.   In doing so,
13 Lockheed presented false claims to an agency of the United States for payment
14 in violation of 31 U.S.C. 3279 (a)(1), (2) and (7).

15     6.    Further, on information and belief, since the entire F-22 is
16 designed around its stealth capability, Lockheed's fraud has directly caused
17 costly delays in the F-22's production.   Lockheed is liable for actual
18 damages from those delays, along with other direct costs incurred by the USAF
19 due to Lockheed's conscious or reckless use and application of known
   defective stealth coatings.
20

21     7.    Relator brings this lawsuit for damages suffered by the United
   States, including principal, interest and penalties as a result of Lockheed's
22 false and fraudulent practices which violated the False Claims Act.
23

24

25  [2] As discussed in Section V, *infra*, and succeeding Sections, the USAF - on information and belief - has made
    progress payments and milestone payments to Lockheed over the course of the 1991 contract. Progress payments
    are periodic (such as monthly) reimbursements for up to 80% of a contractor's costs. Milestone payments are made
26  when a contractor completes a significant stage of a large acquisition contract (such as the development stage).
    Milestone payments include reimbursement for the remaining 20% of the costs (that is, the portion of costs withheld
    from the progress payments) plus the applicable profit.

## II. PARTIES

8.    Relator Darrol O. Olsen is a Materials and Processes Engineer specializing in stealth materials. Olsen was employed in various capacities by Lockheed for 18 years.[3] Because of his expertise in stealth technology, Olsen worked from September 1995 to July 1999 on the F-22. In particular, Olsen worked nearly exclusively on the F-22's coatings, which are essential to that fighter's stealth capability. Olsen lives at 15205 South 4160 Road, Claremore, OK 74017.

9.    Lockheed is a Delaware corporation with its headquarters at 6801 Rockledge Drive, Bethesda, Maryland 20817-1877. Lockheed is the nation's largest defense contractor. On information and belief, Lockheed's subsidiary, Lockheed Martin Aeronautics Company (LMAC), is the prime contractor for the F-22. LMAC's headquarters are at Lockheed Boulevard, Fort Worth, Texas 76108.

### III. JURISDICTION AND VENUE

10.    This is an action to recover damages and civil penalties on behalf of the United States for defendant's violations of the False Claims Act (FCA), 31 U.S.C. 3729 et seq. under the 1991 contract between Lockheed and the USAF; an arrangement which continues through this date.

11.    The FCA provides the United States District Courts with exclusive jurisdiction for actions brought thereunder.

12.    Section 3732(a) provides that "Any action under section 3730 may be brought in any judicial district in which the defendant ... can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred." As noted, on information and belief, Lockheed and Lockheed's subsidiary, LMAC, the prime contractor for the 1991 contract with the USAF for the F-22, do business in the Central District of California.

---

[3] Olsen's Lockheed employment was not continuous but broken up by military duty, education and work for [Northrop] Grumman on the B-2 stealth bomber and other stealth projects.

Plaintiff's Complaint - 5

13.    Pursuant to the FCA, a complaint is filed under seal for at least sixty days and is not served on the defendants until the Court so orders. 31 U.S.C. 3730(b)(2).   The United States may elect to intervene and proceed within the sixty-day period. *Id*. Upon application by the United States, the period to intervene may be extended.   31 U.S.C. 3730(b)(3).   If the United States declines to intervene, the Relator can proceed on the government's behalf.   31 U.S.C. 3730(4)(b).   A Motion to Seal the Complaint is being filed contemporaneously with the Complaint.

## IV.  FCA'S SUBSTANTIVE PROVISIONS

14.    Section 3729 of the FCA provides:

(a) Liability for certain acts.  Any person who –

(1) knowingly presents ... to an officer or employee of the United States Government or a member of the Armed Forces ... a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, ... a false record or statement to get a false or fraudulent claim paid or approved by the Government;

* * *

(7) knowingly makes, uses, ... a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus three times the amount of damages which the Government sustains because of the act of that person...

15.    Section 3729 (c) of the FCA defines a "claim" as: any request or demand ... for money or property which is made to a contractor ... or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor ... or other recipient for any portion of the money or property which is requested or demanded.

## V. REGULATIONS

16. Defendant's violations of the FCA occurred in government contracting, an area controlled by the Federal Acquisitions Regulations (FAR). 41 U.S.C. 421(c)(1). FAR sets forth the requirements binding the executive agencies of the United States and all contractors that provide goods and services to those agencies. 48 C.F.R. 1.101 et seq. Defendant's violations of the FCA specifically involve defense contracting, making relevant the Defense Federal Acquisition Regulation Supplement (DFARS), promulgated by the Department of Defense (DLCD). 41 U.S.C. 421 (c)(2); 48 C.F.R.' 201.301(a) (DLCD implements and supplements the FAR through the DFARS).

17. On information and belief, in the 1991 contract Lockheed incorporated or promised to adhere to certain regulatory requirements, including, but not limited to:

a) 48 C.F.R. 52.212-4(q) ("the Contractor shall comply with all applicable Federal ... laws, ... regulations applicable to its performance under this contract.");

b) 48 C.F.R. 52.212-4(a) ("The Contractor shall only tender for acceptance those items that conform to the requirements of this contract.");

c) 48 C.F.R. 52.246-1 ("the Contractor is responsible for performing ... all inspections and tests necessary to substantiate that the supplies or services ... conform to contract requirements ....");

d) 48 C.F.R. 52.212-4(o) ("the Contractor warrants and implies that the items delivered ... are merchantable and fit for use for the particular purpose described in this contract."); and

e) 48 C.F.R. 252.242.7004 (requiring the contractor to maintain a Material Management and Accounting System that, among other requirements, requires that the contract "[e]nsure(s) that costs of purchased ... material charged ... to a contract are based on valid time-phased requirements" [that is,

material "[n]eeded to fulfill the production plan is charged to a contract in a manner consistent with the need to fulfill the production plan]").[4]

18.    Similarly, on information and belief, Lockheed certified as required by 48 C.F.R. 52.232-5 ( c) in each progress bill that:

I hereby certify, to the best of my knowledge and belief, that –

(1)  The amounts requested are only for performance in accordance with the specifications, terms and conditions of the contract; .... [5]

19.    Further, on information and belief, each progress bill submitted by Lockheed to the USAF for payment was subject to certain other regulations, including, but not limited to:

a) 48 C.F.R. 52.232-16(a)  (each progress payment will not be more frequently than monthly and will be computed "as 80% of the Contractor's total costs incurred"; progress payments include costs paid to subcontractors for supplies and services by subcontract or invoice; the Contractor will not include costs that "are not reasonable");

b) 48 C.F.R. 53.301-1443 (Form 1443: certifying that a progress bill had been prepared "in accordance with" the subject contract, "work reflected [in the progress bill had] been performed" and "the quantities" of work done were "consistent with the requirements" of the subject contract); and

c)  48 C.F.R. 52.232-16 ( c) (Contracting Officer "may reduce or suspend progress payments" for the Contractor's "failure to comply with any material requirement of [the] contract").

20.    On information and belief, upon purportedly achieving contract milestones (or subparts thereof), Lockheed submitted milestone bills to the USAF for payment that contained certifications similar to those required for progress bills.

---

[4] Relator does not have a copy of the 1991 contract, which, on information and belief, is at least partially classified.
[5] See also 48 C.F.R. ' 32.502-4 (directing that the progress payment clause under ' 52.232-16 be inserted into the fixed-price contracts where the United States will pay progress payments).

## VI. FACTS

A.    Relator's Background

21.    In 1971, Olsen began working for Lockheed in a clerical capacity. From October 1972 to September 1974, Olsen was on active duty with the U.S. Navy and became familiar with the use of RADAR. Following active duty, Olsen was in the naval reserves for four years and continued to do RADAR-related work.

22.    After active duty, Olsen returned to his clerical position at Lockheed from 1975-79, with educational leaves of absences. In 1979, Olsen received a B.S. in biosciences with a minor in chemistry.

23.    In 1979, Lockheed hired Olsen as an engineer into Research Engineering at its Burbank, California facility. There, Olsen performed R&D on items supporting numerous programs, including work on stealth technology which included the F-117, the first fighter referred to a "stealthy".

24.    Olsen worked in the nonmetal (or composite) materials area of the F-117 program. Among other responsibilities, Olsen tested the effects of heat, moisture and fatigue on stealth composite materials. Given the newness of stealth technology, the F-117 program was cutting edge.

25.    From 1982-88, Olsen worked for Northrop Grumman Corporation (Northrop). Olsen was assigned to the F-18 stealth fighter and the B-2 stealth bomber. The B-2 was then in its developmental stages, but would become the pre-eminent stealth combat plane of its time. Olsen worked on numerous other classified programs at Northrop involving stealth technology.

26.    In 1988-89, Olsen returned to Lockheed. He was again assigned to the F-117 program, focusing on advanced composite materials and stealth coatings.

27.    In 1990, Olsen took a job with Northrop, focusing full-time on the B-2 at the B-2 production facility in Palmdale, CA. Subsequently, he performed work at Edwards Air Force Base for B-2 flight tests. As a stealth

1   engineer, Olsen worked on all stealth aspects of the B-2, especially its
2   coatings.

3        28.    Olsen became a Senior Engineer Specialist at Northrop.    Due to
4   his work experience, Olsen had become a recognized expert on stealth
5   coatings.    While Northrop had roughly 120,000 employees assigned to the B-2
6   program, only about 20 had Olsen's level of knowledge about stealth
7   materials.    In fact, Northrop chose Olsen out of approximately 3,000
    engineer-candidates to be its Military Corporate Field Representative and
8   Advisor to the USAF on the B-2's stealth coatings and on other stealth
9   issues.    Northrop assigned Olsen to Whiteman Air Force Base, the B-2's
10  military home.

11       29.    Despite the newness of the stealth work, Northrop met the
12  Government's low observable stealth specifications.    Olsen confirms every
13  square inch of the B-2's coatings was successfully tested for conductivity,
14  smoothness, beta back scatter, thickness and reparability.[6]  Olsen later
15  recalled Northrop's integrity in ensuring the B-2's stealthiness, when he
16  witnessed a radically different attitude and conduct upon returning to
17  Lockheed.

18
19
20
21
22
23
24

---

25      [6] Conductivity refers to the coating's ability to direct electrical impulses; beta back scatter refers to
    pointing RADAR at a coating which then throws back the RADAR; and reparability refers to the ability to restore
26  the RADAR absorbing/reflecting properties to applied coatings that have been damaged from gouges, weather, fuel,
    etc. The term beta back scatter refers to a beta ray emitted from a hand-held device that determines coating
    thickness.

B.   The F-22's Background

30.   In the early 1970s, the USAF began studying concepts for an Advanced Tactical Fighter (ATF) to replace the F-15.   The ATF concept would evolve into the F-22.   In October 1985, the USAF requested proposals for the F-22 design.   Seven aerospace defense contractors responded, including Lockheed.   Each contractor was required to include in its proposal a description of its stealth skills and experience.

31.   Prior to selecting the winning design, the USAF suggested that the contractors form teams so that the best industry expertise could be brought to bear on such a technologically challenging project.   Each contractor would submit a separate design.   However, the winning contractor would be the team leader; and the other team members would work on the F-22 as designed by the winning contractor.   Lockheed, Boeing and General Dynamics formed one team.

32.   On April 23, 1991, the USAF selected Lockheed's design, making Lockheed the team leader and prime contractor for the F-22 project.[7]   Lockheed assigned the work, giving itself the lion's share.   Lockheed assumed responsibility for most of the F-22's stealth capability, including the coatings.

C.   The 1991 Lockheed Contract

33.   On information and belief, Lockheed and the USAF in 1991 entered into a fixed price contract that required Lockheed - subject to USAF approval and consistent with the contract specifications - to deliver 648 by F-22s at a cost of $86.6 billion or about $134 million per fighter.[8]

---

[7] As noted, on information and belief, the prime contractor was LMAC, Lockheed's subsidiary.

[8] The F-22 program has been marked by delays and climbing costs. After over 20 years, approximately $40 billion has been expended and the F-22 is still not officially operational, although about 25 planes have been completed. Further, the DoD over the years has whittled down the projected number of planes that it will ultimately order. Defense Secretary Rumsfeld has recently stated that he wants to reduce the 2006 budget to allow for only 180 F-22s. The current price tag is about $250 million, or more, per fighter. Leslie Wayne, *Air Force Campaigns to Save Jet*

34.    On information and belief, Lockheed submitted a certification with the 1991 contract attesting that it would comply with the coating specifications set forth in the "Statement of Work," which was part of that agreement.   On information and belief, the "Statement of Work" set forth the requirements for reflectivity (RCS signature) and reparability, among other specifications.[9]

35.    Further, on information and belief, Lockheed certified in the 1991 contract that it would comply with all applicable laws and regulations, including those set forth in the Sect. V, *supra*.

D.    The Importance of Stealth to the F-22

36.    As indicated, stealth capability is a core feature of the F-22. The purpose of stealthiness is to prevent the aircraft from being detected by ground-to-air RADAR or by air-to-air RADAR.    The entire F-22 is designed around its stealth capability.

37.    The observability of an aircraft by RADAR is referred to as its RADAR Cross Section (RCS) or RADAR signature.  The F-22's RCS should at most indicate to a RADAR sender an object no bigger than a bumblebee.

38.    The key to stealthiness is to minimize the RADAR return to the RADAR-emitting source either by reflecting the RADAR wave away from the RADAR-emitting source or by absorbing the RADAR wave.   RADAR reflection is primarily a function of shaping the aircraft.   The F-22 is contoured because straight lines tend to reflect RADAR waves directly back to their sources. The aircraft must also be as seamless as possible because surface breaks in the aircraft surface create "hot spots" causing higher RCS.

*Fighter*, N.Y. Times, Jan. 13, 2005, at C1.
[9] As noted in Sect. IV.D, *infra*, RCS signature refers to RADAR Cross Section, which essentially means the observability (or detectability) of an object by RADAR. *See also* note 6, *supra* (describing reparability as being able to restore the RADAR reflecting/absorbing properties to [damaged] coatings).

Plaintiff's Complaint - 12

39.    Composite materials give lower RCS than metals and reflect RADAR waves away from the RADAR-emitting source.  The F-22's design also requires use of electrical coatings on its skin to reflect away or absorb the RADAR waves.

40.    RADAR absorbing material (RAM) absorbs – rather than reflects – RADAR waves due to iron particles that have absorbent properties.  RAM is typically applied to such "hot spots" as around antennas and vertical supports.

41.    The F-22 requires several different coatings to be applied to the skin of the aircraft.  The first coating is a primer designed to smooth and seal the skin.  The second is a conductive coating consisting of silver flakes mixed with polyurethane materials and intended to reflect the RADAR waves away.  The third is the topcoat, which has infrared properties to reduce RADAR detection.

42.    Taken together, the three coatings must be paper thin and light. Weight is especially important because the F-22 is designed to be a "supercruiser," able to fly at supersonic speeds without an afterburner. Additional weight slows the F-22.

43.    The proper functioning of the coatings is essential to the F-22's stealth capability.  If those coatings are not effective, the other stealth measures of the aircrafts' design are negated.  The F-22 then becomes a highlighted target.

E.    1995-2004: Continuous and Undisclosed Coatings Problems

44.    In September 1995, Olsen returned to Lockheed in the Materials and Processing Group as a Senior Engineering Technical Specialist, the highest grade below management.  Olsen eventually reported to Supervisor Richard Morrison and Manager David Trawinsky.  The latter reported to the Chief Engineer for F-22 Structures, John Hammond.

1.    1996: Coatings Problems, Tests Ordered and Results Misrepresented

45.   Olsen devoted almost full-time to working on F-22's stealth requirements; particularly, the coatings.  When he began in September 1995, the stealth coatings area of the F-22 program was already approximately two (2) years behind schedule.  By late 1995, Olsen observed that the conductive coatings provided by CAAP CO. had visible problems, such as <u>inconsistent batches</u> and <u>abrading</u> from moisture.  Boeing's topcoat coating was unstable as to its infrared properties and coloring.  Olsen learned that those coatings had not been formally tested, according to industry protocol.

46.   The normal stages of formal testing are:

1) Lockheed's Engineering Testing Laboratory (ETL) tests the coatings' viscosity, weight and composition.  Additionally, ETL applies coatings to panels and checks materials properties; including, but not limited to, conductivity, thickness and smoothness;

2) RCS tests reflectivity and reparability by directing RADAR at the coatings on 6' x 3' football panels.[10]  Additionally an RCS signature is captured at this point.

3) Lockheed's RCS department tests reflectibility and reparability at the Compact RADAR Range by directing RADAR at the coatings on football panels from various angles and at various frequencies.  ETL fabricates the coatings system on the football panels and requests testing from the compact range. RCS oversees the tests and interprets the data.

4) RCS department tests reflectivity and reparability of the coatings on mock-up sections of the F-22;

5) RCS department tests the reflectivity and reparability of the coatings on a F-22 in a hanger; and

6) RCS department tests the reflectivity and reparability of the coatings on an F-22 during ground and flight tests at Edwards Air Force Base.

[10] ETL and the RCS department (in later stage tests) also check the amount of damage due to normal events such as abrasions and water/fuel on the panels.

Plaintiff's Complaint - 14

1  Under no circumstances should testing proceed to a subsequent stage if the
2  coatings have not passed the current stage.  As Olsen would soon learn,
3  Lockheed paid no heed to that fundamental protocol.[11]

4      47.  In February 1996, Olsen directed that formal testing commence
5  starting with the first stage of ETL testing.  Olsen instructed ETL to remove
6  coatings on panels that had CAAP CO.'s conductive coating and Boeing's
7  topcoat coating to determine whether damages to those coatings (such as,
8  scratches, gouges and abrasions) were repairable.  ETL would then spray on or
9  brush on more of the CAAP CO. and Boeing coatings to the damaged areas.  If
10 the original coatings met specifications, repairs using the same coatings
   should have met the designated RCS signatures and other specifications.

11     48.  Olsen witnessed each 1996 test.  The repairs failed every time.
12 For instance, the "repaired" coatings visibly blistered when exposed to
13 fluids, such as aircraft fuel, cleaning solvents and even water.  The
14 coatings also disfigured when touched.  Despite those first stage failures,
15 Morrison and Trawinsky directed, improperly, that testing proceed to the
16 football panel stage.

17     49.  Throughout 1996, Olsen reported the failed results at the weekly
18 meetings of the Low Observable Group and the Stealth Maintenance and Repair
19 Test (SMART) Group, the two internal groups most involved in stealth issues.
20 Morrison and Trawinsky, among other Lockheed managerial personnel, attended
   those meetings.

21     50.  On occasion, the USAF would attend the weekly meetings.  When it
22 did, Morrison and Trawinsky instructed Olsen not to speak with the USAF.
23 Nor, did Lockheed management disclose anything negative about the coatings.
24 Rather, if discussing the coatings at all, Lockheed management falsely

25

26

[11] The RCS department did not do the fifth stage test while Olsen was there. The[ hangar] for that test had not yet been built. Lockheed went right to the ground and flight test stage regarding the coatings.

Plaintiff's Complaint - 15

reported to the USAF that the coatings were "satisfactory" and that any problems were "repairable."

51.  Lockheed continued to order defective coating materials from CAAP CO., and Boeing and LMAC.

2.   1997: The Cycle Continues

52.  During 1997, the cycle continued: failed tests, unwarranted progressions to subsequent test stages, orders for more defective coatings and misrepresentations to the USAF.

53.  Olsen expressed concern to Morrison and Trawinsky that the CAAP CO., and Boeing coating materials could not be corrected. Although the LMAC materials were purchased for test, they were not tested due to coating failure. Olsen was ordered to stay the course. Further, they reemphasized that Olsen was never to discuss the coatings problems with the USAF. Indeed, they instructed Olsen to have no communications at all with the USAF.

54.  On information and belief, Lockheed wanted to isolate Olsen and his written and vocalized concerns about the coatings. On numerous occasions when Olsen told Morrison and Trawinsky that the coatings were failing, he was told to: "stay out of it," or "keep your mouth shut," or "you can be replaced" or "if you are not a team player, you will be replaced." At other times, Morrison and Trawinski would ban Olsen from areas where tests were to be conducted or meetings conducted with the USAF.

55.  Along with heading-off or concealing negative reports from the USAF, Lockheed falsely portrayed the coatings as successful. For instance, on November 11, 1997, Trawinski nominated the "Brush and Roll Repair Paint Team" (which included Olsen) for an award due to purportedly demonstrating that "the brush and roll restoration process meets the RCS requirements." However, it did not, and it never had met RCS requirements.

56.  Just two weeks earlier, Olsen had informed Lockheed management of another failed test:

1) The resin system shows dissolution with light wiping using the [CAAP CO. conductive coating] spec cleaning solvent ....

2) Silver flakes do not bind to the resins system.  Flakes are easily removed when wiped with a cloth or abraded.

3) Light abrading with very fine sandpaper/polishing abrasives remove the surface silver and affects electrical/RCS properties.

4) Distribution of silver flake throughout the coating is not uniform.

5) Frequent clusters of silver flakes (clumping) are creating bumps in coating.

Thus, Lockheed management knew the award had no truthful basis.  The award falsely conveyed the impression to all concerned that the coatings were working, when they were not performing.

57.   On information and belief, the USAF attended the award ceremony. Olsen present, as required, but he refused to participate in a sham ceremony.

58.   Sham awards notwithstanding, the stealth coatings project continued its failures, falling further behind schedule.

3.   1998: "No One Cares. We've Got to Meet Milestones"

59.   The coatings problems did not abate.  On information and belief, Lockheed continued throughout 1998 to make misrepresentations to and conceal the failures from the USAF regarding the coatings.  For instance, in a March 17, 1998, summary chart entitled "Problems with Silver Paint That Were Discovered During Repair Development," Olsen listed each problem and Morrison's directions for actions-to-be-taken.  Those directions were telling.  If the coatings had failed a test, Morrison's direction amounted to don't do that test.

60.   In early 1998, Olsen went to Trawinsky to again press his concerns about the inability of the coatings to satisfy the contract specifications.  Trawinsky's response was: "No one cares.  We've got to meet

1  the milestones."  In other words, Trawinsky was only interested in the flow
2  of payments from the USAF and the appearance of timely project progress.[12]

3       61.  Olsen persisted.  In a March 1998 meeting with Morrison and
4  Trawinsky, Olsen told them that: "If you don't allow me to fix it [the
5  coating problem by replacing the vendors], then a year from now the plane
6  will be in the hanger and someone will tell you we have a failure."  Morrison
7  and Trawinsky didn't budge.  They instructed Olsen to continue with the test
8  stages and order another $1 million worth of the same defective materials.
9  Olsen did as directed.  The coatings kept failing, as everyone knew they
   would.

10      62.  On July 2, 1998, ETL issued another test report of coatings
11 failures on football panel tests.[13]  Olsen wrote a note on the report and
12 forwarded it to Morrison: "Rich- Another report showing flake loss & resin
13 softening.  Does this bother you?"  Morrison responded: "No - because RCS of
14 repair OK & Yes - because we need to soak a spot on football panel w/topcoat
15 & measure RCS."  Besides misstating what the report showed, Morrison would
16 not address the basic problem that the coatings were bad out of the
17 suppliers' drums.  The problems with the coatings were the coatings.

18      63.  An obvious solution was to look at other suppliers such as those
19 who had supplied coatings to the B-2 and other stealth aircraft.  Morrison
   and Trawinsky refused.

20      64.  In a July 7, 1998, memo to Trawinski and Morrison, Olsen
21 recounted that he had retesting done on the conductive paint, with the
22 "results ... yield[ing] the same problems" of inconsistent batches, along
23 with degradation from solvents, from aircraft fuels and from rubbing with dry
24

25 _____
   [12] *See generally* 48 C.F.R.' 52-232-16( c) ("The Contracting Officer may reduce or suspend progress payments,....,
26 after finding ... [for example] (1) The Contractor failed to comply with material requirement of this contract .... (2)
   Performance of this contract is endangered by the Contractor's ... failure to make progress ....")
   [13] As noted, football panel tests should not even have been done since the coatings had not passed the first stage test.

Plaintiff's Complaint - 18

1  cloths.  Olsen further recounted that: "Per Rich Morrison's direction, I have
2  asked RCS Engineering to determine how much degradation to the coating
3  electricals is acceptable.  Their response was no degradation can be
4  permitted."  In other words, rather than fixing the problem by using
5  different suppliers [such as those used by Northrop on the B-2 stealth
6  bomber], Morrison suggested lowering the coating specifications requirements.

7      65.  Notwithstanding the consistent stream of failures, Morrison
8  continued to falsely portray the coatings as meeting specifications.  On
9  September 24, 1998, Morrison gave a presentation at the "Low Observables
10  Steering Group", which consisted of the Lockheed teams from LMAC's, Materials
11  & Processes and RCS departments.  The USAF attended.  Among the Lockheed
12  personnel who attended were ETL's Ronald Michaels, who had conducted the ETL
13  tests, and the RCS department's Paul Ryan, who had overseen that department's
14  coating tests.  Morrison's presentation showed the coatings passing most all
15  tests.  Afterwards, Olsen spoke with Ryan and Michaels and asked how Morrison
16  could report that the coatings were passing.  They jointly responded that
    they were going to "let Morrison hang himself".

17      66.  As they had before, the coatings failed after that meeting.  CAAP
18  CO.'s conductive coating remained inconsistent in makeup, weight, viscosity
19  and visual characteristics from batch to batch.  Silver flakes clumped
20  together.  Rubbing with a soft cloth abraded the conductive coating, released
21  the silver flakes, destroyed the coating's electrical properties and left a
22  gummy resin.  Solvents and jet oil similarly damaged the coating.  Boeing's
23  topcoat coating was unstable as to its infrared properties and coloring.  The
    LMAC conductive coating had problems similar to the CAAP CO. product.

24      67.  Morrison seemed increasingly desperate to substantiate the false
25  representations that the coatings were passing.  For instance, he directed
26  ETL engineer Linda M. Campbell to show in an October 1, 1998 report that the
    coatings had registered stable on all tests.  Having observed those tests,

Plaintiff's Complaint - 19

1  Olsen protested that such a conclusion was not supported by the test.
2  Morrison told him: "It is all political, stay out of it."

3      68.   The coatings continued to fail tests no matter how many tests
4  were performed at whatever stage.   In a December 9, 1998, work schedule
5  entitled "Silver Paint & Topcoat Repair Schedule - No. 13", Olsen noted that
6  "BASELINE COATINGS FAILED RCS RANGE TESTING" AND "SILVER PAINT MATL.
7  PROBLEMS. ALL TESTING ON HOLD FOR TESTING OF PRODUCTION MATL."

8      69.   On information and belief, throughout 1998, Lockheed continued to
9  defraud the USAF about the coatings failures to keep progress and milestone
10  payments flowing, as well as to convey the misimpression that the F-22 was
11  making timely progress in the stealth coating issues.   In fact, rather than
    moving forward, the stealth coatings issues were mired in failure.

12  4.   1999: Olsen Leaves Lockheed; the Coatings Problems Remain

13      70.   The coatings failures continued in 1999, as attested by a
14  Management Presentation Document, dated February 4, 1999, entitled "Items
15  that Directly Contribute to Silver Restoration Problems".   Indeed, the
16  coatings failures were so undeniable that even a Trawinsky schedule entitled
17  "F-22 Silver Paint Implementation", dated April 1, 1999, records numerous
18  failed tests.   Conductive coating added 200 lbs., RAM 400 lbs.   This new LMAS
    conductive coating was also found to be easily damaged by fluids and
19  therefore, was over-coated with several layers of primer (which did not meet
20  engineering requirement) adding even more weight to the 600 lbs. weight gain
21  aforementioned above.   But on information and belief, Lockheed never shared
22  those test results with the USAF.

23      71.   Until Olsen took medical leave in July 1999, the CAAP CO.
24  conductive coating and the Boeing topcoat never passed the necessary tests.
25  Nor, did the LMAC versions of the conductive coatings ever pass the necessary
26  tests.   Yet, on information and belief, Lockheed continued to represent to
    the USAF that the coatings (1) were meeting requirements or that any problems

1   (2) were repairable.   At no time to Olsen's knowledge did Lockheed every
2   truthfully disclose to the USAF that the coatings were defective, rendering
3   the stealth attribute a failure.

4        72.   On information and belief, to avoid any unexpected governmental
5   inspection of those defective materials, Morrison and Trawinsky had coating
6   shipments delivered to their homes and those of other employees.   Olsen
7   refused to participate in that scheme.   Nevertheless, Morrison forged Olsen's
8   name to CAAP CO. purchase orders (and, on information and belief, to purchase
9   orders from the other suppliers) directing delivery of shipments to homes of
    Lockheed employees, all of which operated to perpetrate the "stealth fraud."

10       73.   In 1999, Lockheed began using more conductive coatings from LMAC.
11  By June of that year, Lockheed ceased using the CAAP CO. conductive coating
12  altogether.   On information and belief, the problems with that defective
13  product had become so obvious that Lockheed believed that it could not hide
14  its failures any longer.

15       74.   However, at no time during Olsen's tenure at Lockheed did he see
16  any indication that Lockheed informed the USAF about the CAAP CO. coatings
17  failures.   Further, during Olsen's tenure at Lockheed the LMAC coatings never
18  satisfied or passed the reflectivity and reparability tests.   To the extent
19  those coatings were tested at all, the LMAC products failed just as the CAAP
20  CO. and Boeing products had.

21       75.   Due to serious gastro-intestinal problems that required surgery,
22  Olsen took medical leave on July 12, 1999.   He attempted to come back in
23  August 1999 but was prevented by a Lockheed doctor, who refused to clear
24  Olsen for work.   Lockheed terminated Olsen in November 1999 purportedly for
    "refusal to follow company instructions." Lockheed never elaborated.

25       76.   By the time of Olsen's termination, the stealth coatings project
26  had fallen years behind schedule.

    5.   2000-2004: Failures and Misrepresentations Continue [through present]

Plaintiff's Complaint - 21

77.   Following Olsen's June 1999 departure and at least through October 2004, if not through the present, the LMAC conductive coatings and the Boeing topcoat coatings have failed.  The LMAC conductive coating failed, consistently, the reparability tests at least through October 2004.[14]  By the same token, at least through October 2004, the Boeing topcoat coating's infrared properties continued to fail and its coloring, important for visual stealthiness, was inconsistent.[15]

78.   The LMAC conductive coatings only passed the reflectivity tests when Lockheed applied six (6) times the thickness, thereby adding approximately four hundred pounds to the "supercruiser" F-22.  Indeed, much more weight than that was added because Lockheed needed to apply extra RAM to fill all gaps and structural flex points.  In reality, the six (6) times additional thickness of conductive coating added hundreds of pounds to the supercruiser, and, an additional 400 pounds was added with the extra RAM material needed to cover failing conductive coatings over the gaps, seams and structural flex points.

79.   The extra coatings have proved brittle, resulting in cracking, fissures and heightened RCS.  In short, the conductive coatings – that were supposed to be paper thin and light by design - have so materially failed that, on information and belief, the F-22's velocity and maneuverability have been compromised by the added weight.

80.   On information and belief, Lockheed at least through October 2004 has never truthfully disclosed to the USAF that the stealth coatings continually failed the requisite tests.  On information and belief, at least

---

[14] In particular, the conductive coating left a di-electric or non-conductive area in the periphery of the repair.

[15] Correct coloring is necessary for the F-22 to blend in with the sky.

Plaintiff's Complaint - 22

through October 2004, if not the present, the stealth coatings project had been delayed many years and hundreds of millions of dollars have been wasted (1) on the process and (2) on the defective aircraft. Our country does not have the stealth fighter for which it paid.

F.    Incentives to Deceive

81.    On information and belief, Lockheed knew that by fraudulently misleading the USAF about the coatings failures, it would continue to receive (1) progress and (2) milestone payments, and that the concealment would convey the impression that the F-22 program was timely progressing. On information and belief, Lockheed had substantial incentives to lie to the USAF about the defective coatings, all of which caused the USAF to expend hundreds of millions of dollars for worthless coatings, defective aircraft and unnecessary delays. The ultimate victims are the American taxpayers. The direct victims are the U.S. government and the military personnel who will be put at risk because of the defects.

COUNT ONE

False Claims Act, 31 U.S.C. 3729(a)(1)

82.    Relator re-alleges and incorporates the allegations contained in paragraphs 1 through 81 of this complaint.

83.    This is a claim for treble damages, civil penalties and other relief under the False Claims Act, 31 U.S.C. 3729 (a)(1).

84.    Defendant Lockheed used coatings on the F-22 that it knew were deficient. Olsen had direct, personal knowledge of that fact.

85.    Lockheed knowingly violated the regulations in FAR and DFARS, of certifications for the 1991 contract, of certifications in the progress bills, of certifications in the milestone bills and of representations in other documents and presentations. Lockheed, in order to obtain payment from the United States, misrepresented to the USAF that the coatings had passed reflectivity and reparability tests and had otherwise met the contract

1    specifications for the F-22 when in fact the coatings had continuously failed
2    such tests and had not met contract specifications.

3          86.   On information and belief, by those knowing violations, Lockheed
4    knowingly presented false or fraudulent claims in the form of progress bills
5    and milestone bills to the USAF for payment in violation of 31 U.S.C. 3729
6    (a)(1).

7          87.   On information and belief, the USAF paid the false or fraudulent
8    claims presented in the form of Lockheed's progress bills and milestone
     bills.
9
10         88.   By reason of these payments of false or fraudulent claims, the
     United States has been damaged in a substantial amount, entitling the United
11   States to multiple damages, penalties, attorneys' fees and other relief under
12   the FCA.

13   COUNT TWO

14   False Claims Act, 31 U.S.C. 3729 (a)(2)

15         89.   Relator re-alleges and incorporates by reference the allegations
16   contained in paragraphs 1 through 88 of this complaint.

17         90.   This is a claim for treble damages and civil penalties under the
     False Claims Act, 31 U.S.C. 3729 (a)(2).
18
19         91.   Defendant Lockheed used coatings on the F-22 that it knew were
     deficient.  Olsen had direct, personal knowledge of that fact.
20
           92.   Lockheed knowingly violated the regulations in FAR and DFARS, of
21
     certifications in the 1991 contract, of certifications in the progress bills,
22
     of certifications in the milestone bills, and of representations in other
23
     documents and presentations.  Lockheed, in order to obtain payment from the
24
     United States, misrepresented to the USAF that the coatings had passed
25   reflectivity and reparability tests and had otherwise met the contract
26   specifications for the F-22 when in fact the coatings had continuously failed
     such tests and had not met contract specifications.

                          Plaintiff's Complaint - 24

93. On information and belief, by the wrongful uses of certifications in the 1991 contract, of certifications in the progress bills, of certification in the milestone bills and of representations in other documents and presentations, Lockheed knowingly presented false or fraudulent claims in the form of progress bills and milestone bills to the USAF for payment in violation of 31 U.S.C. 3729 (a)(2).

94. On information and belief, the USAF paid the false or fraudulent claims presented in the form of defendant's progress bills and milestone bills.

95. On information and belief, by reason of these payments of false or fraudulent claims, the United States has been damaged in a substantial amount, entitling the United States to multiple damages, penalties, attorneys' fees and other relief under the FCA.

COUNT THREE

False Claims Act, 31 U.S.C. 3729 (a)(7)

96. Relator re-alleges and incorporates by reference all the allegations made in paragraphs 1 through 87 of this complaint.

97. This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. 3729 (a)(7).

98. On information and belief, Lockheed used coatings on the F-22 that it knew were deficient.

99. Lockheed knowingly violated the regulations in FAR and DFARS, of certifications in the 1991 contract, of certifications in the progress bills, of certifications in the milestone bills and of representations in other documents and presentations. Lockheed, in order to obtain payment from the United States, misrepresented to the USAF that the coatings had passed reflectivity and reparability tests and had otherwise met the contract specifications for the F-22 when in fact the coatings had continuously failed such tests and had not met contract specifications.

Plaintiff's Complaint - 25

100. On information and belief, by the wrongful uses of the certifications in the 1991 contract, the certifications in the progress bills and in other false and fraudulent documents, Lockheed knowingly presented false or fraudulent claims in the form of progress bills and milestone bills to the USAF for payment in violation of 31 U.S.C. 3729 (a)(2).

101. On information and belief, by those knowing violations, Lockheed knowingly made false records and statements to conceal its existing, legal obligations to repay the United States for the unearned money from payments for the defective coatings from progress bills and milestone bills in violation of 31 U.S.C. 3729(a)(7).

102. On information and belief, by reason of Lockheed's conduct, the United States has been damaged in a substantial amount, entitling the United States to multiple damages, penalties, attorneys' fees and other relief under the FCA.

WHEREFORE, Relator Olsen requests that judgment be entered against defendant Lockheed ordering that:

A. Defendant cease and desist violating the False Claims Act, 31 U.S.C. 3729, et seq.;

B. Defendant pay not less than $5,000 and not more than $10,000 for each violation of 31 U.S.C. 3729 for each unlawful submission, whether direct or indirect, of false or fraudulent information in connection with requests for payment [including progress bills and milestone bills], plus three (3) times the amount of the damages that the United States has sustained, because of Lockheed's unlawful actions from and after February 1996 when the F-22 stealth coatings failed reflectivity and reparability tests through the present date;[16]

---

[16] The damages sought include all actual damages incurred by the United States due to defendant Lockheed's fraud. On information and belief, those damages include, but are not limited to, the costs of the defective coatings, the

1       C.   Defendant also be directed to disgorge all sums by which it has
2   been enriched unjustly by its wrongful conduct;

3       D.   Defendant be enjoined from concealing, removing, encumbering or
4   disposing of any assets which may be required to pay all civil monetary
5   penalties imposed by the Court;

6       E.   Relator be awarded an appropriate share allowed pursuant to 31
7   U.S.C. 3730(d); and

8       F.   Relator be awarded all costs of this action, including statutory
    attorneys' fees and costs pursuant to 31 U.S.C. 3730(d).

9                        REQUEST FOR TRIAL BY JURY

10      Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator
11  Darrol Olsen hereby demands a trial by jury.

12                              PRAYER

13    WHEREFORE, Relator/Plaintiff prays that this District Court enter
14  judgment on behalf of the Plaintiff and against the Defendant for the
15  following:

16      a.   Damages in the amount of three (3) times the actual damages
17  suffered by the United States Government as a result of the Defendant's
18  conduct which violated the False Claims Act, as well as all other relief
    available under the False Claims Act;

19
20      b.   Relator/Plaintiff be awarded all costs and expenses of this
    litigation, including statutory attorneys' fees and costs of court;

21
22      c.   Pre-judgment and post-judgment interest, at the highest rate
    allowed by law;

23
24      d.   All other relief on behalf of the Relator/Plaintiff or the United
    States Government to which either may be justly entitled, whether at law or
25  in equity, which the District Court deems just and proper.

26

costs from the application and testing of the defective coatings, the costs of repairs to the F-22 because of the defective coatings and the costs from the delays in the F/A -22 program from use of the defective coatings.

---

Dated: October 1, 2007

UNITED STATES OF AMERICA, **ex rel.**
**Darrol Olsen**

Respectfully submitted:

**BOYD & ASSOCIATES**                    Warren – Benson Law Group

Samuel L. Boyd                           Donald R. Warren
SBN: 02777500                            Phillip E. Benson
6440 North Central Expy                  7825 Fay Ave., Ste. 200
Suite 600                                La Jolla, CA 92037
Dallas, Texas 75206                      Telephone (858) 454-2877
(214) 696-2300                           Facsimile  (858) 454-5878
(214) 363-6856 fax
**ATTORNEYS FOR RELATOR/PLAINTIFF**

Plaintiff's Complaint – 28

1

2                          **CERTIFICATE OF SERVICE AND DISCLOSURE**

3          On or before September 27, 2007, a Disclosure Statement and exhibits

4    were served upon Mr. Paul J. Wogaman, Trial Attorney, U.S. Department of

5    Justice, 601 D St., NW, #9006, Washington, D.C. 20004, regarding Relator's

6    complaints, the Defendant's violations and Relator's intention to file suit.

7          On this date, October 1, 2007, a copy of Relator's/Plaintiff's

8    Complaint and Amended Disclosure Statement (w/ Exhibits, which were served on

9    September 27, 2007 on Paul J. Wogaman) was formally served pursuant to FRCP

10   4(i)(1)(b), via Certified Mail, Return Receipt Requested, upon:

11   Peter D. Keisler
     Acting United States Attorney General of the United States
12   U.S. Department of Justice
     950 Pennsylvania Avenue NW
13   Washington, DC 20530-0001

14   Mr. Paul J. Wogaman (Via Federal Express)
     Trial Attorney
15   U.S. Department of Justice
     601 D St., NW, #9006
16   Washington, D.C. 20004

17                                    _____

18                                    Samuel L. Boyd P.C.

19

20

21

22

23

24

25

26

BOYD & ASSOCIATES    Fax 2143636856    Sep 28 2007 06:28pm    P005/038

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**ORIGINAL**

| | |
|---|---|
| **I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)<br><br>Darol Olsen | **DEFENDANTS**<br><br>Lockheed Martin Corporation |
| **(b)** County of Residence of First Listed Plaintiff (Except in U.S. Plaintiff Cases): | County of Residence of First Listed Defendant (In U.S. Plaintiff Cases Only): |
| **(c)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)<br>Boyd & Associates          Warren and Benson<br>6440 N. Centr Expr, # 600   7825 Fay Ave, #200<br>Dallas, Texas 75206          La Jolla, CA 92037<br>(214) 696—2300             (858) 454-5878 | Attorneys (If Known)<br><br>Unknown |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☑ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question (U.S. Government Not a Party)

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:  JURY DEMAND:** ☑ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes  ☑ No          ☑ **MONEY DEMANDED IN COMPLAINT:** $ 100,000,000+

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
31 U.S.C. 3729 et seq. (False Claims Act)(Filed Under Seal)

**VII. NATURE OF SUIT** (Place an X in one box only.)

☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 810 Selective Service
☐ 850 Securities/Commodities /Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 890 Other Statutory Actions
☐ 891 Agricultural Act
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Info. Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes

☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Fed. Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Personal Injury-Med Malpractice
☐ 365 Personal Injury-Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**CIVIL RIGHTS**
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/Acco-mmodations
☐ 444 Welfare
☐ 445 American with Disabilities - Employment
☐ 446 American with Disabilities - Other
☐ 440 Other Civil Rights

**PRISONER PETITIONS**
☐ 510 Motions to Vacate Sentence Habeas Corpus
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus/Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**FORFEITURE/PENALTY**
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS-Third Party 26 USC 7609

**VIII(a). IDENTICAL CASES:** Has this action been previously filed and dismissed, remanded or closed? ☑ No ☐ Yes

If yes, list case number(s):

**FOR OFFICE USE ONLY:**  Case Number:

CV-71 (07/05)          CIVIL COVER SHEET          Page 1 of 2

CV07- 06385   ER  (CWx)

UNITED STATES D... RICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET
AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

**VIII(b). RELATED CASES:** Have any cases been previously filed that are related to the present case? ☑No ☐Yes

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or
☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** List the California County, or State if other than California, in which EACH named plaintiff resides (Use an additional sheet if necessary)
☑ Check here if the U.S. government, its agencies or employees is a named plaintiff.

Oklahoma

List the California County, or State if other than California, in which EACH named defendant resides. (Use an additional sheet if necessary).
☑ Check here if the U.S. government, its agencies or employees is a named defendant.

Maryland

List the California County, or State if other than California, in which EACH claim arose. (Use an additional sheet if necessary)
Note: In land condemnation cases, use the location of the tract of land involved.

Los Angeles, Texas

**X. SIGNATURE OF ATTORNEY (OR PRO PER):** _[signature]_   Date   September 28, 2007

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Edward Rafeedie and the assigned discovery Magistrate Judge is Carla Woehrle.

The case number on all documents filed with the Court should read as follows:

## CV07- 6385 ER (CWx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

==================================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[X] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[ ] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA



## NOTICE OF FILING CIVIL CASES UNDER SEAL

Seal -V- Seal

Case No. ____CV07-6385-ER (CWx)_____

Date Filed: _10/1/07_____

Nature of Suit: ___370_____

County Code: ___Los Angeles_____

Low Number: ☐Yes   ☒ No

**NOTE:** This form must be routed to Case Opening.